IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| VALERIE BARTON, | ) | Case No. 1:17-cv-00029 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff Valerie Barton, seeks judicial review of the final decision of the Commissioner

of Social Security denying her application for supplemental security income ("SSI") under Titles

II and XVI of the Social Security Act.  This matter is before the court pursuant to 42 U.S.C.

§1383(c)(3), 42 U.S.C. §405(g), and Local Rule 72.2(b).

Because a portion of the Commissioner's decision is not based on substantial evidence I

recommend that the final decision of the Commissioner be **VACATED** and the matter be

**REMANDED** for further limited proceedings as described below.

## II.      Procedural History

Barton applied for SSI on January 25, 2013, alleging a disability onset date of January 1,

2010.  (Tr. 17)  Barton alleged disability based on lower back pain, mental issues, and hepatitis

C.  (Tr. 122)  Barton's application was denied.  (Tr. 17)  Administrative Law Judge Traci M.

Hixon ("ALJ") heard the matter  on August 17, 2015.  (Tr. 17)  On December 24, 2015, the ALJ

denied Barton's claim.  (Tr. 17-32)  The Appeals Council denied review of that decision on November 15, 2016, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3)

## III.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423 (d)(2)(A).

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. Id.

## IV.  The ALJ's Decision

The ALJ issued a decision on December 24, 2015. Her findings can be summarized as follows:

1. Barton has not engaged in substantial gainful activity since January 25, 2013, the application date. (Tr. 19)

2. Barton has the following severe impairments: degenerative disc disease of the lumbar spine, degenerative joint disease of the knees, hepatitis C, mood disorder, post-traumatic stress disorder, panic disorder, and polysubstance abuse in reported remission. (Tr. 19)

3. Barton does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 20)

4. Barton has the residual functional capacity ("RFC") to perform less than the full range of light work except she can lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for six hours of an eight-hour workday and sit for six hours of an eight-hour workday with a sit/stand option every hour for about 5 minutes, not leaving the workstation; perform occasional climbing of ramps and stairs, but never ladders, ropes, or scaffolds; perform occasional balancing, stooping, and crouching; but cannot kneel or crawl; reach in all directions; handle, finger, and feel; perform simple, routine tasks with

simple, short instructions; make simple decisions and have few workplace changes; have superficial interaction with co-workers, supervisors, and the public; cannot be exposed to unprotected heights and moving machinery, work in a fast pace production quota environment, engage in negotiation or confrontation. (Tr. 22)

5. Barton is unable to perform any past relevant work.  (Tr. 30-31)

6. Barton was born on July 17, 1963, and was 49 years old, which is defined as a younger individual age 18-49, on the date the application was filed, and has subsequently changed age category to closely approaching the advanced age. (Tr. 31)

7. Barton has at least a high school education and is able to communicate in English.  (Tr. 31)

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the Barton is "not disabled," whether or not Barton has transferable job skills. (Tr. 31)

9. Considering Barton's age, education, and work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (Tr. 31)

Based on these findings, the ALJ determined that Barton had not been under a disability since January 25, 2013 through the date of the decision.  (Tr. 32)

Barton challenges this decision, claiming that the ALJ failed to accord appropriate weight to the medical opinions of both the treating physician and the treating psychiatrist and the non-treating consultative examiner.  ECF Doc. 12, Page ID# 1272.  She also contends that the ALJ's RFC finding was not supported by substantial evidence, in part because the ALJ incorrectly decided that there was no medical necessity for Barton to use a cane which had been prescribed. Id. at 1277.  Barton further argues that the ALJ should have found her "disabled" under Rule 201.14 of the Medical–Vocational Guidelines.  The Commissioner argues that the medical opinions and records support the ALJ's decision, that Barton did not challenge the ALJ's findings that her allegations were not credible, and that substantial evidence supports the ALJ's

RFC finding.

## V. Evidence

### A. Personal, Educational, and Vocational Evidence

Barton was born on July 17, 1963 and was 49 years old at the time the application was filed. (Tr. 16) Barton turned 50 before the ALJ's decision was issued. Id. Barton completed the eleventh grade and later obtained a GED. (Tr. 42) Barton was self-employed in 2010, working at her home as a childcare provider. (Tr. 47-48) Barton alleged that she further injured her lower back in a fall on January 22, 2015. (Tr. 1095)

### B. Medical Evidence

#### 1. Medical Evidence Pertaining to Neck and Back Impairments

X-ray imaging of Barton's left hip and lumbar spine performed in 2009 showed that Barton had a mild degenerative anterolisthesis of L5 upon S1 and some associated facet arthropathy. (Tr. 330) On November 29, 2012, Dr. Rodrigo Cordero evaluated Barton for low back pain at the Cleveland Clinic Foundation's Pain Management Center. (Tr. 253) Barton reported that her pain began 3-4 years earlier, with no specific trigger, and the symptoms had worsened over the prior three months. (Tr. 253, 255) Barton had reported that her pain was constant with a score of seven on the best day and ten on the worst day, on a scale of zero to ten. (Tr. 253) On examination, Barton's left buttock was tender to palpitation in the gluteus medius and minimus distribution, the greater trochanteric bursa was tender to a lesser extent, and there was painful range of motion with hip flexion. (Tr. 255) Dr. Cordero prescribed physical therapy, trigger point injections, and over the counter medications. Id.

On December 11, 2012 Barton underwent a spine evaluation with physical therapist Marie Soha at the Cleveland Clinic Rehabilitation and Sports Therapy facility. (Tr. 328) Barton

displayed minimal to moderate decreased range of motion in the thoracic and lumbar spines, with decreased strength in the left ankle and left hip, increased tone in the lumber paraspinals, and significant tenderness in the lower posterior superior iliac spine.  (Tr. 330-31)

On December 27, 2012, Pavan Tankha, DO and Dr. Richard Rosenquist performed gluteus medius and minimus trigger point injections.  (Tr. 269)  After the procedure, Barton reported that her pain level was zero on a scale of zero to ten.  (Tr. 270)

In January 2013, Barton received aquatherapy from Dr. Mark Hjelmeland at the Cleveland Clinic Rehabilitation and Sports Therapy facility.  (Tr. 340)  After the January 20, 2013 therapy session, Barton reported constant pain in the lower back and lumbar spine center, which she rated five on a scale of zero to ten.  (Tr. 341)

On January 21, 2013, Dr. Yumi Oh and Dr. Andrei Brateanu evaluated Barton for back pain and headache, or bilateral soreness.  (Tr. 783)  Barton stated that she was diagnosed with fibromyalgia.  (Tr. 784)  Barton also reported that she had started having headaches one month prior to that date, which lasted for "minutes" and occurred three to four times a day.  (Tr. 783-84)

On January 24, 2013, in an appointment with Dr. Rosenquist and Dr. Maged Guirguis, Barton reported that her low back pain symptoms had recurred three days after she received the injections on December 27, 2012.  (Tr. 280)  Barton also reported a throbbing pain located on her left or right scalp that radiated to the back of her head.  Id.  Dr. Rosenquist noted tenderness on palpitation in the gluteus medius and minimus distribution on both sides, and the straight leg exam and FABER test were positive, while knee provocative maneuvers were negative. (Tr. 282)  Barton received bilateral gluteus medius and minimus trigger point injections and Dr. Rosenquist

prescribed additional injections and continued physical therapy and aquatherapy. Id. The following day, Barton filed this claim for disability benefits. (Tr. 121)

On April 22, 2013, Dr. Albert Sey and Dr. Malti Vij evaluated Barton in a routine outpatient visit at which Barton complained that her back pain was getting worse and requested a prescription for a cane. (Tr. 789) An examination showed that range of motion was normal in Barton's hips, knees, shoulders, and spine and that she had a normal gait. (Tr. 790) Dr. Sey made a referral, stating: "[W]ill see pain management in a week for prescription for cane." Id.

On April 29, 2013, Dr. Rosenquist evaluated Barton for pain in her low back, buttock, and right knee. (Tr. 405, 531) Barton reported that her lower back pain was always present, and, like her knee pain, was exacerbated by standing or walking. Id. Barton reported that her knee often felt like it would give out on her. Id. Dr. Rosenquist observed tenderness on palpation over Barton's lumbar spine, bilateral lumbar paraspinal muscles, and the upper gluteal muscles and that Barton had difficulty going from sitting to standing. (Tr. 407, 533) Dr. Rosenquist found that Barton's symptoms were consistent with her degenerative changes and the associated muscular pain. (Tr. 408, 534) Dr. Rosenquist prescribed physical therapy, weight loss, and a cane to help with walking and to keep Barton steady when her right knee gives out. Id. On May 6, 2013, physical therapist Wendy W. Warner provided Barton with and a cane and taught Barton how to use it for her knee pain. (Tr. 412, 538)

On May 23, 2013, Dr. Andriy Viter and Dr. Nana Kobaivanova saw Barton for a medication follow-up, recheck, and refill request. (Tr. 794) Barton reported that she was suffering from depression and hearing voices, which she tried not to listen to. Id. Dr. Viter advised Barton to follow up with her psychiatrist. Id. Barton also reported that she lived with

her boyfriend and he took care of her.  Id.  Dr. Viter noted that Barton did not have any health

insurance, and wouldn't be able to afford medications to treat her hepatitis C infection.  (Tr. 796)

On June 3, 2013, Barton missed a physical therapy appointment because she had

bronchitis or pneumonia.  (Tr. 416, 551)  Barton was referred to Dr. Marisa Wynne, who

evaluated Barton on July 18, 2013.  (Tr. 455)  Barton reported that the pain level in her back and

knees was an eight out of ten.  (Tr. 455)  Dr. Wynne noted that Barton's duration for standing

and walking were unremarkable and the duration for sitting was 10 minutes.  Id.  Dr. Wynne

discussed with Barton the need for her to lose weight and ordered an x-ray of Barton's lumbar

spine to determine if the spondylolisthesis had progressed.  (Tr. 456)  The x-rays of Barton's

lumbar spine performed that same day showed mild L4 on L5 and L5 on S1 anterolisthesis, L4,

L5, S1 facet hypertrophy, and no fracture or destructive lesions.  (Tr. 467)  The L4 on L5

anterolisthesis increased with flexion and there was L4 and L5 pars irregularly, which was

possibly secondary to a pars defect or facet hypertrophy.  Id.  Barton underwent bilateral

sacroiliac join injections on September 26, 2013.  (Tr. 839-40)  On January 21, 2015, Barton

reported numbness in her right hand in the mornings.  (Tr. 1085)

On February 3, 2015, Dr. Vijay Parekh evaluated Barton for her lumbar pain.  (Tr. 1094)

Barton reported that on January 22, 2015 she fell on concrete and landed on her lower back.  (Tr.

1095)  Barton stated that there was pain in her left back that radiated to her left groin which

worsened with lateral flexion.  (Tr. 1094)  Barton also reported that she had not taken tramadol

since May and had been taking Motrin for pain relief.  (Tr. 1095)  An x-ray of Barton's spine

showed new compression fracture deformities of the L1 vertebral body, spurring of multiple

endplates, and degenerative changes of the distal lumbar spine.  (Tr. 1104)

On May 12, 2015, Dr. Kutaiba Tabbaa evaluated Barton's lumbar pain, which she reported had gradually worsened. (Tr. 1137) Barton had missed two appointments for sacroiliac joint injections. Id. Dr. Tabbaa noted that Barton's back showed a normal range of motion and her strength and deep tendon reflexes were normal in all extremities. (Tr. 1138) However, there was tenderness to palpation over Barton's paraspinal muscles in a painful area. Id. A lumbar x-ray showed minimal L1 fracture and no pelvic bone problems. (Tr. 1139). Dr. Tabbaa prescribed physical therapy and Voltaren, but no chronic opioid therapy. Id.

## 2. Medical Evidence Pertaining to Mental Health

On March 18, 2013, Barton was taken to the hospital and received emergency crisis treatment for reportedly having hallucinations, including hearing voices telling her to put her head in an oven. (Tr. 286) Barton reported that she had used crack cocaine for twenty years, but had been clean for five to six years. (Tr. 288) Barton also admitted to occasional marijuana and alcohol use. Id. Barton was discharged home after she refused to stay in the crisis unit. (Tr. 695) On March 29, 2013, Barton was diagnosed with moderate major depressive disorder and the psychiatrist prescribed continued use of Zoloft. (Tr. 696) On May 22, 2013, Barton's case at the hospital was closed because the crisis was resolved. (Tr. 292) Barton reported that she was compliant with the Zoloft medication and had noticed a decrease in symptoms. Id.

On September 19, 2013, Barton followed-up for additional mental health treatment with Licensed Independent Social Worker Adrian Jurkiw. (Tr. 821) Barton reported experiencing auditory hallucinations when she was depressed and cognitive problems with memory and attention. (Tr. 822) Barton also reported that she was experiencing nightmares, flashbacks, numbness, and avoidance of triggers from her history of sexual assault. (Tr. 824) Social Worker Jurkiw observed that Barton's mood was depressed, anxious, and that Barton felt somewhat sad

and depressed and diagnosed Barton with mood disorder, chronic post-traumatic stress disorder, and rule out cannabis and alcohol abuse.  (Tr. 826)

On November 20, 2013, Dr. Gabriela Feier of the MetroHealth System assessed Barton's mental health.  (Tr. 872)  Dr. Feier found that Barton was circumstantial, her affect was emotional and labile, and she had auditory and visual hallucinations, questionable insight and judgment, and a depressed and overwhelmed mood.  (Tr. 877)  Dr. Feier diagnosed Barton with mood disorder (not otherwise specified), post-traumatic stress disorder, panic disorder without agoraphobia, alcohol use in early full remission, marijuana abuse, and cocaine dependence in full sustained remission.  Id.  Dr. Feier prescribed continued use of Zoloft, Abilify, and counseling. (Tr. 878)

On December 17, 2013, Barton reported auditory and visual hallucinations and depression.  (Tr. 890)  Dr. Feier discontinued Zoloft, continued Abilify, and prescribed Wellbutrin XL.  (Tr. 891)  On January 24, 2014, Dr. Feier observed that Barton was anxious, her thought process was logical and organized, and she had fair insight and judgment.  (Tr. 901)  Dr. Feier increased the prescribed dosage of Wellbutrin XL.  (Tr. 902)

After Barton's fiancé was in an intensive care unit and died in February 2014, Barton cancelled all of her appointments, did not refill or change any of her medications, and went without medication for some weeks before her appointment with Dr. Feier on April 11, 2014. (Tr. 962)  Barton reported having visual hallucinations and difficulty sleeping.  Id.  Dr. Feier observed Barton was depressed and labile with significant stressors.  Id.  Dr. Feier again prescribed Wellbutrin XL and referred Barton for counselling and for the trauma group at The MetroHealth System.  (Tr. 963)  On May 13, 2014, Barton attended a Trauma Recovery and Empowerment Group therapy session.  (Tr. 974)  Barton also saw Dr. Feier that day and Barton

reported that she was hearing voices, not eating well, losing weight, and had been unable to get her medicine.  (Tr. 980)

### C.    Opinion Evidence

#### 1.    Occupational Therapist – Lidiya Kanarsky

On May 2, 2013, occupational therapist Lidiya Kanarsky performed a functional capacity examination of Barton, after Dr. Brateanu referred Barton to Kanarsky with a diagnosis of lumbago and lower back pain.  (Tr. 298)  Barton reported that her last grade completed in school was the eleventh grade and that she last worked in 2005, when she was self-employed as a childcare provider in her home from approximately 2004 to 2005.  Id.  Kanarsky noted that Barton was deconditioned and demonstrated weak hand strengthening and upper body strengthening overall, there was no medical diagnosis to indicate that Barton's function was affected by a medical condition, and that Barton would benefit from a home exercise program to optimize her endurance and strength.  (Tr. 299)  Kanarsky found that Barton would be able to tolerate a part-time, sedentary job task.  Id.

#### 2.    Treating Physician – Dr. Andrei Brateanu

Dr. Brateanu prepared a medical source statement regarding Barton's physical capacity, in which he found Barton could lift 7 lbs. occasionally and 13 lbs. frequently, stand or walk for 15-20 minutes, sit for 40 minutes, climb or balance rarely, and stoop, crouch, kneel, or crawl occasionally.  (Tr. 301)  Dr. Brateanu also found that Barton could occasionally reach, push or pull, conduct fine manipulation or gross manipulation, Barton's pain would cause absenteeism, and she would require approximately three additional rest periods during an average day.  (Tr. 302)

### 3. Treating Psychiatrist - Dr. Gabriele Feier

On June 13, 2014, Dr. Feier prepared a mental source statement regarding Barton's mental capacity. (Tr. 984) Barton had been under the care of Dr. Feier since November 20, 2013 for treatment of Barton's mood disorder, post-traumatic stress disorder, panic disorder without agoraphobia, alcohol abuse in remission, marijuana abuse, cocaine dependence in remission, and rule-out major depressive disorder with psychotic features. (Tr. 986) Dr. Feier reported that Barton could occasionally: maintain attention and concentration for extended periods of two hour segments; respond appropriately to changes in routine settings; deal with the public; function independently without redirection; work in coordination with or proximity to others without being distracting; deal with work stress; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember, and carry out complex job instructions; understand, remember, and carry out detailed, but not complex job instructions; behave in an emotionally stable manner, or relate predictably in social situations. (Tr. 984-86) Dr. Feier reported that Barton could frequently: follow work rules, use judgment, maintain regular attendance and be punctual within customary tolerance; relate to co-workers; interact with supervisor(s); understand, remember, and carry out simple job instructions; maintain her appearance; socialize; manage funds or schedules; or have the ability to leave her home on her own. Id.

### 4. Consultative Examiner – Dr. David House

On May 30, 2013, consultative examiner David House, Ph.D. examined Barton, at the request of the Social Security Administration. (Tr. 304-11) Dr. House noted Barton complained of back pain, hepatitis C, and pneumonia and was taking Metoprolol and the prescription drug

Proventil.  (Tr. 305)  Dr. House also noted that Barton had gone to Cleveland Clinic's emergency room in March of 2013 for mental health treatment and had been prescribed Sertraline and was supposed to go to counselling.  Id.  Dr. House observed that Barton walked with a limp, assisted by a cane.  (Tr. 306)  Dr. House noted that Barton denied hearing voices, but claimed she had an imaginary friend.  (Tr. 307)  Dr. House reported that Barton was tangential, disorganized, had limited mathematical capabilities, and felt that her delusions were diagnostic as to her levels of emotional maturity.  (Tr. 307-08)  Dr. House diagnosed Barton with schizoaffective disorder, post-traumatic stress disorder, and cocaine abuse in reported remission.  (Tr. 309)  Dr. House stated that Barton's prognosis was poor, but that she needed further treatment and assessment. (Tr. 310)  Dr. House determined that Barton may consistently have difficulty following directions, especially multi-step directions, would have some difficulties interacting with others consistently, and would be disorganized and dysfunctional in a work environment.  (Tr. 310)  Dr. House assigned Barton a global assessment of functioning sore of 40.  (Tr. 311)

### 5. Non-examining, Non-treating Sources

On May 10, 2013, Dr. Jeffrey Vasiloff completed an assessment of Barton's RFC.  (Tr. 112-15)  In his assessment, Dr. Vasiloff limited Barton to lifting and/or carrying 50 lbs. occasionally and 25 lbs. frequently and sitting or standing or walking for six hours in an eight-hour workday. (Tr. 113-14)  Dr. Vasiloff determined that Barton's ability to push and/or pull and balance were unlimited, other than the limitations for lifting and carrying.  (Tr. 114)  Dr. Vasiloff found Barton could frequently climb ramps or stairs, stoop, kneel, crouch, and crawl, but she could never climb ladders, ropes, or scaffolds.  Id.  On April 2, 2014, Dr. Gerald Klyop performed a physical RFC assessment on Barton that reached the same conclusions.  (Tr. 132-134)

On August 29, 2013, Irma Johnston, Psy.D. completed a mental RFC assessment of Barton. (Tr. 115-17) Dr. Johnston found that Barton had moderate limitations in her ability to: perform activities within a schedule, maintain regular attendance, and be punctual; work in coordination with or proximity to others without being distracted by them; complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (Tr. 115-17)

On March 19, 2014, Janet Souder, Psy.D. completed a mental RFC assessment of Barton. (Tr. 134-36). Dr. Souder found that Barton had the same moderate limitations as Dr. Johnston identified in her assessment, as well as a limited ability to maintain attention and concentration for extended periods. Id.

Dr. Johnston did not review the evidence from Barton's treating psychiatrist, Dr. Feier, because that evidence had not been created or submitted at the time of her mental RFC assessment. ECF Doc. 12, Page ID# 1269. Dr. Souder also did not review the evidence from Dr. Feier's last two evaluations of Barton or Dr. Feier's mental RFC assessment of Barton. (Tr. 129).

### D.    Testimonial Evidence

#### 1.    Claimant's Testimony

Barton testified that she lived in an apartment by herself on the fourteenth floor of a building. (Tr. 42-43) Her driver's license had expired and Barton testified that a friend brought her to the hearing. Id. Her highest level of education was the eleventh grade but she had

obtained a GED. Id. Barton testified that she smoked "a half a pack [of cigarettes] a day" and smoked marijuana to relieve her pain. (Tr. 43) Barton stated that she had not consumed alcohol in about a year and had not used cocaine in about six years. Id. Barton testified that she watched television, read love stories, prepared light meals for herself, washed dishes, and handled her own personal care and hygiene. (Tr. 43-44) Barton stated that she had a niece that would come to her apartment to take care of some of the household needs Barton could not perform, like doing laundry, taking out the trash, and vacuuming. Id. Barton testified that her niece also took Barton shopping sometimes. (Tr. 44) Before suffering her fall, Barton liked to go out to dance or to movies. (Tr. 44-45) She testified that, other than a church member who would come by to see her, Barton had not gotten together with her family or friends lately, because her pain had become unbearable. (Tr. 45) She stated that she had not attended church services in about two months. (Tr. 46) Barton testified that on a typical day she would get up at 6:30 AM and then sit around and watch the news or make breakfast in her kitchen until her niece came to her apartment to set out Barton's clothing and do her hair. Id. Barton testified that, other than preparing meals, she would only watch television and nap all day. Id.

Barton testified that she last worked in 2010 as a self-employed childcare provider out of her home. (Tr. 47-48) She stated that she took care of a four-year-old child and a newborn baby until the children's mother lost her job. (Tr. 49)

Barton testified that she was unable to work at the time, because she was unable to stand for more than fifteen minutes at a time and she would have to sit down when walking due to chronic pain in her lower back, which she had suffered from since 2009. Id. Barton testified that waking, lifting things, and certain movements would aggravate her back pain. (Tr. 49, 57) Barton stated that her pain was a seven on a scale of zero to ten on a normal day and nine on a

bad day. (Tr. 58)  Barton also testified that her medication and the injections failed to alleviate her back pain, in part because she found the injections to be too painful. (Tr. 50)  Barton also stated that, although the aqua therapy helped a little bit, she found the therapy too painful and stopped going after trying it a few times. Id.

Barton testified she had arthritis in her knees, which were swollen and would "give[] out" on her when she walked. (Tr. 51)  Barton stated that she had been using a cane for two or three years, which a doctor at the Cleveland Clinic had prescribed for her. (Tr. 52).

Barton testified that she was not experiencing any effects from her hepatitis C infection, even though she was not receiving treatment for the disease due to limitations in her insurance coverage. (Tr. 51).

Barton also testified that she was depressed. (Tr. 50)  She stated that she "had it for a while," but that her depression worsened after she lost her loved one on Valentine's Day the prior year. (Tr. 51)  Barton testified that her depression made her irritable with other people and the medications her doctors prescribed were not helping her condition. Id.  Barton testified that she had not heard any voices lately, but she would still see things sometimes. (Tr. 52, 60)  She also stated that she went to counseling once a month. (Tr. 54)

Barton testified that she was taking several medications, including Metoprolol, Risperidone, pain medication, and an inhaler. (Tr. 52-53)  She claimed to suffer side effects from her medication, including nausea and drowsiness. (Tr. 54)

Barton testified that she believed she could lift and carry ten to fifteen pounds for a short amount of time. Id.  She stated she could stand for fifteen minutes before wanting to sit down, and she could walk for half a block with the assistance of her cane. Id.  She testified she could sit for ten or fifteen minutes before she would want to get up. (Tr. 54-55)  She stated that she

had no trouble reaching for things in front of her, but she occasionally had difficult holding

things due to numbness in her fingertips.  (Tr. 55)  Barton testified that she could pick up a pen

and write, but could not go up and down stairs, get down on both knees, crawl, or be around

large groups of people without difficulty.  (Tr. 55-56)  She also stated that she had trouble

remembering things like her doctor's appointments, but that she remembered to take her

medications with her niece's assistance.  (Tr. 56-57)

### 2. Vocational Expert, Gene Burkehammer

Vocational expert and licensed clinical counselor Gene Burkehammer testified that

Barton had prior work experience as a daycare worker, performed at a light level of exertion, but

that the job had no associated skills that could be transferred to sedentary work.  (Tr. 63)  The

VE testified that a person with Barton's identified limitations would not be able to perform

Barton's past work.  (Tr. 64)  He testified that a person who could lift thirteen pounds

occasionally and seven pounds frequently would be limited to sedentary work.  (Tr. 65)  The VE

also testified that the use of a cane would reduce Barton's RFC to sedentary, which would

eliminate all light jobs.  (Tr. 66)  Finally, he testified that a hypothetical worker similar to Barton

who would be absent from work two days per month on a regular basis would be unemployable.

(Tr. 66-67)

### VI.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the

record to support the ALJ's findings of fact and whether the applicable legal standards were

applied correctly.  *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003)

("decision must be affirmed if the administrative law judge's findings and inferences are

reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied. If not, reversal is required, unless the error was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.    Barton's Claims of Error

Barton presents three arguments for review.  First, she contends that the ALJ erred by not giving controlling weight to the opinions of the threating physician and treating psychiatrist and failed to provide good reasons for having chosen not to.  ECF Doc. 12, Page ID 1272.  Second, Barton argues that the ALJ failed to give appropriate weight to the opinions of the Social Security Administration's consultative examiner.  Id.  Third, Barton argues that the ALJ's RFC finding, including the determination that Barton's cane was not medically necessary, was not supported by substantial evidence.  Id. at 1277.

### C.    The ALJ Properly Evaluated the Opinion of Dr. Feier

Barton argues the ALJ did not properly evaluate whether Dr. Feier was Barton's treating physician and failed to provide "good reasons" for rejecting Dr. Feier's opinion.  ECF Doc. 12, Page ID# 1272.  The Commissioner counters that the ALJ provided the following good reasons for assigning limited weight to Dr. Feier's opinion: (1) the ALJ reasonably relied on the opinions

of state agency reviewing psychologists, which were generally consistent with the record as a whole; (2) Dr. Feier's opinion was not consistent with Barton's activities of daily living; (3) Barton did not receive intensive outpatient mental health services; and (4) Dr. Feier seemed to accept many of Barton's allegations that the ALJ found were not credible.  ECF Doc. 13, Page ID# 1229, 1304.

Evidence from doctors who treat Social Security applicants must be weighed using specific requirements created by the federal government.  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  The ALJ must examine what work the treating source performed.  *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record."  *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If an ALJ does not give the treating source opinion controlling weight, the ALJ must use several factors to determine the weight to give the opinion, including: the length, frequency, nature, and extent of the treatment relationship; supportability; consistency; specialization; and other factors which support or contradict the opinion.  20 C.F.R. § 416.927(c).  The ALJ is not required to explain how she considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion.  20 C.F.R. § 416.927(c)(2); *see also Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned.").  The ALJ's "good reasons" must be "supported by the

evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  As the Sixth Circuit has noted,

> The conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors.  Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion.  Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id*. at 377.  Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir.2007) (emphasis added)).  However, the ALJ is not obligated to provide an "exhaustive factor-by-factor analysis." *See Francis v. Comm'r of Soc. Sec.* 414 Fed. App'x. 802, 804 (6th Cir. 2011).

   As discussed above, Dr. Feier prepared a mental source statement regarding Barton's mental capacity on June 13, 2014.  (Tr. 984)  Dr. Feier's mental source statement indicated, among other things, that Barton would only occasionally be able to maintain attention and concentration for extended periods, respond appropriately to changes in routine settings, deal with the public, work in coordination or proximity to co-workers, behave in an emotionally stable manner, or complete a normal workday and workweek without interruption from

psychologically based symptoms. (Tr. 984, 986) Dr. Feier stated that her assessment was supported by Barton's diagnoses of mood disorder, post-traumatic stress disorder, panic disorder without agoraphobia, alcohol abuse in remission, marijuana abuse, cocaine dependence in remission, and rule-out major depressive disorder with psychotic features. (Tr. 986)

Barton complains that the ALJ did not discuss whether Dr. Feier was even a treating source, and she never stated that Feier was not entitled to controlling weight. The court need not discuss these allegations in detail. It is readily apparent that Feier's opinions were granted only limited weight. Even if the ALJ erred by not analyzing Dr. Feier's status as a treating source, the error would be harmless if the ALJ set forth good reasons for the weight assigned to Dr. Feier's opinions. I conclude she did.

The ALJ stated that she assigned limited weight to Dr. Feier's opinion "in light of the fact that the claimant lives alone, took care of her terminally ill boyfriend, and she has not required or received intensive outpatient mental health services." (Tr. 30) The ALJ also stated "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." (Tr. 23) With regard to all clinical assessments, mental status examinations, and the course of treatment in this case, the ALJ stated:

> The undersigned finds that the clinical assessments/mental status examinations and course of treatment in this case are not consistent with disabling mental impairment and are more consistent with the stated residual function capacity. The claimant has not been psychiatrically hospitalized and she has not required or received intensive outpatient mental health services.

> The claimant is not fully credible and she is more capable than alleged. At medical appointments, the claimant repeatedly denied having any difficulty performing or completing routine daily activities []. At medical appointments, the claimant repeatedly denied having any concerns about safety in the home/falls []. In October 2013, the claimant reported that she was caring for her boyfriend with end stage liver disease [].

> At the time of application, the claimant stated that lower back pain, mental issues, and hepatitis C limited her ability to work and she stopped working on November 30, 2010 as

> a daycare worker because of her conditions [].  However, at the hearing, the claimant testified that she last worked in 2010 doing childcare for a newborn and a 4-year-old, and the job ended because the children's mother lost her job so the claimant's services were no longer needed.

(Tr. 28-29)  The ALJ also stated "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible."  (Tr. 23)  The ALJ was not persuaded by Barton's subjective complaints and alleged limitations.  (Tr. 30).  Thus, the ALJ based her weighting of Dr. Feier's opinions on the practical realities of Barton's daily living and upon her conclusion that Barton's disability allegations were not credible.

As the Commissioner notes, Barton has not challenged the ALJ's credibility finding. ECF Doc. 13, Page ID# 1304.  Generally, "[a]n ALJ's findings based on credibility of the applicant are to be accorded great weight and deference, particularly since [the] ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir.2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).  An ALJ may reject medical opinions based on a claimant's self-reports where the reports themselves lack credibility or where the claimant is not credible."  *Wyatt v. Colvin*, No. 12-CV-289, 2013 WL 4080718, at *4 (S.D. Ohio Aug. 13, 2013).  Further, "[t]he mere diagnosis of a condition does not speak to its severity or indicate the functional limitations caused by the ailment.  *See Taylor v. Comm'r of Soc. Sec. Admin.*, No. 14CV686, 2015 WL 4730716, at *3 (N.D. Ohio Aug. 10, 2015) (citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir.1990)).  The court must defer to the ALJ's credibility determination, and that determination, in turn, provided substantial evidence for her decision to discount the opinions of Dr. Feier.

Substantial evidence also supports the ALJ's conclusion that Barton's daily activities were inconsistent with her claimed disabilities.  "Daily activities are one factor than an ALJ may

consider in evaluating 'the intensity and persistence of [a claimant's] symptoms . . . and determining the extent to which [these] symptoms limit [the claimant's] capacity for work." *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 120 (6th Cir. 2016) (quoting 20 C.F.R. § 404.1529(c)(3)(i)); 416.929(c)(3)(i)).  The ALJ cited record evidence showing Barton was able to perform a wide range of daily activities.  (Tr. 28)  The ALJ noted that Barton attended to her own personal care, prepared meals, washed dishes, watched television, read "everything," cared for her boyfriend with end stage liver disease, and attended medical appointments without incident.  (Tr. 21, 29, 43, 46)  The ALJ stated, "In light of the fact that the claimant lives alone and had the capacity to care for her terminally ill boyfriend, the undersigned finds that difficulties are no more than moderate.  (Tr. 21)

The ALJ's detailed discussion of Barton's medical record also supports the ALJ's decision to give limited weight to Dr. Feier's mental source statement.  *C.f. Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 731 (N.D. Ohio 2005) (finding that the ALJ's extensive discussion of the plaintiff's treating history provided substantial evidence to support the ALJ's decision to give little probative weight to a physician's RFC assessment, even though the ALJ failed to perform a formal analysis of the opinion under § 404.1527(d)).  For example, the ALJ noted Dr. Feier observed Barton appeared well groomed, her behavior was cooperative and calm, her speech was spontaneous and normal, her thought process was logical and organized, there was no evidence of perceptual disturbance, Barton's attention and concentration were sustained, her affect was full range, and her recent and remote memory were within normal limits.  (Tr. 27)

In addition, the ALJ relied upon two state agency psychologists who reviewed the record in this case and found Barton's mental impairments only moderately limited her ability to work. Agency regulations provide that state agency reviewing sources are highly skilled medical

professionals who are experts in social security issues. *See* 20 C.F.R. § 416.927. This provided substantial evidence to discount Dr. Feier's conflicting opinions.

Barton argues that the ALJ improperly gave "considerable weight" to the report and opinions of the state agency psychologists, Dr. Johnston and Dr. Souder, because their reviews of the records did not include the most recent treatments notes. ECF Doc. 12, Page ID# 1275. This argument is without merit.

Dr. Johnston's August 29, 2013 mental RFC assessment included Barton's 2013 mental health treatment records and consultative examiner Dr. House's medical opinion. (Tr. 110) Dr. Souder's March 19, 2014 mental RFC assessment included Dr. Feier's first three treatment notes from November 2013 through January 2014. (Tr. 129). The ALJ gave Dr. Johnston's and Dr. Souder's opinions "considerable weight" because they were "generally consistent with the record as a whole including the clinical findings on examination and the claimant's activities of daily living." (Tr. 30)

Courts in the Sixth Circuit have held that "[t]here is no categorical requirement that the non-treating source's opinion should be based on a 'complete' or 'more detailed and comprehensive' case record." *Taylor v. Comm'r of Soc. Sec. Admin.*, No. 14CV686, 2015 WL 4730716, at *11 (N.D. Ohio Aug. 10, 2015). Rather, "opinions need only be 'supported by evidence in the record.'" Id. (quoting *7D' Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir.2011)). When an ALJ grants greater weight to a non-examining physician's studies based on an incomplete case review, the ALJ must indicate that she has considered the subsequently-generated evidence. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir.2007)). The ALJ's discussion of Dr. Feier's June 2014 mental source statement and her treatment notes from her evaluation on

April 11, 2014, make it apparent that the ALJ considered evidence generated after the non-treating psychologists Drs. Johnston and Souder completed their assessments (Tr. 27, 30)

The ALJ's explanation demonstrates that she properly considered the regulatory factors and discounted Dr. Feier's opinion based on the supportability of the opinion and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 404.1527(d)(2). The ALJ conducted a detailed review of Barton's medical record, which included discussion of Dr. Feier's examinations of Barton. (Tr. 27, 30) The ALJ therefore presented good reasons for assigning less than controlling weight to Dr. Feier's opinion and fulfilled her obligations under the regulations. *See e.g. Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009).

### D. The ALJ Properly Evaluated the Opinion of Dr. Brateanu

Barton also argues that the ALJ improperly assigned little weight to the opinions of treating pain management specialist, Dr. Brateanu. ECF Doc. 12, Page ID#1276. As to Dr. Brateanu's opinion, the ALJ stated,

> On May 21, 2013, Andrei Brateanu, M.D., completed a medical source statement about the claimant. He expressed the opinion that the claimant can frequently lift/carry 13 pounds and occasionally lift/carry 7 pounds based on the findings of [a] physical capacity evaluation (PCE ("physical capacity evaluation")) conducted by Ms. Kanarsky on May 1, 2013; can stand/walk for a total of 15 to 20 minutes of an 8-hour workday; can sit for a total of 40 minutes of an 8-hour workday; can occasionally reach and push/pull; can occasionally perform fine and gross manipulation; has been prescribed a cane; and she needs to elevate her legs at will at 45 degrees []. The undersigned gives Dr. Brateanu's opinions little weight because the PCE report clearly indicates that the claimant's limitations are based on being deconditioned. The objective findings are inconsistent with the level of limitations. For example, there are no objective findings to support manipulative limitations or the need to elevate legs. The extreme limitations on sitting, standing, and walking are not supported by the objective medical evidence or clinical findings on examination.

(Tr. 29)

Barton argues that the ALJ failed to analyze whether Dr. Brateanu was Barton's treating physician. ECF Doc. 12, Page ID# 1276. The Commissioner counters that Dr. Brateanu is not a

treating physician because Dr. Brateanu only saw Barton once before he issued his medical source statement. ECF Doc. 13, Page ID# 1302. The Commissioner's argument a non-persuasive *post hoc* rationalization, because the ALJ made no finding on this issue. The Court may not sustain the weighing of the Brateanu opinion on that basis.

However, an ALJ may give a treating source's opinion less than controlling weight if the opinion is not well-supported by medically acceptable clinical or laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544; 20 C.F.R. § 404.1527(c)(2)). The ALJ found Dr. Brateanu's opinion that Barton had extreme physical limitations to be unsupported. Id. Specifically, the ALJ determined there were no objective findings to support Barton's manipulative limitations, her to elevate her legs, or Barteanu's view that she had "extreme limitations on sitting, standing, and walking." The ALJ found that the objective medical evidence, clinical findings on examination, and course of treatment reflected in the medical record are not consistent with Barton's complaints of disabling physical pain. (Tr. 28) The ALJ noted that most of Barton's physical examinations were unremarkable. Id. The ALJ also noted Barton did not complete the full eight weeks of physical therapy her physical therapist had recommended and Barton missed appointments for her sacroiliac joint injections. Id. From the course of treatment and Barton's apparent conclusion that she didn't need to follow through with recommended treatments the ALJ found that Barton's symptoms and limitations were not as severe as alleged. Id.

Also, as discussed above, substantial evidence also supports the ALJ's conclusion that Barton's daily activities are inconsistent with her alleged limitations. (Tr. 21, 28, 29, 43, and 46) Further, the ALJ noted that Barton made statements that are inconsistent with her alleged limitations. At medical appointments, Barton repeatedly denied having any difficulty

performing or completing routine daily living activities or any concerns about the safety in her home or falls. (Tr. 29, 263, 284). In addition, the ALJ relied on the opinions of the state reviewing physicians, Drs. Vasiloff and Kylop, which revealed only moderate limitations. (Tr. 29)

The ALJ also found that Dr. Brateanu's opinion was inconsistent with other substantial evidence, including Ms. Kanarsky's PCE of Barton. Id. In that PCE, Ms. Kanarsky concluded Barton was "strongly deconditioned and would strongly benefit from a home exercise program" and found there was no medical diagnosis to believe that Barton's function was affected by a medical condition. (Tr. 299)

Barton argues that Dr. Brateanu did not identify Ms. Kanarsky's PCE as the sole source of his opinion. ECF Doc. 12, Page ID# 1276. Indeed, Dr. Brateanu's medical source statement states that his assessment is based on "exam findings," "osteoarthritis," "pain in lower leg," "buttock pain," and "history." (Tr. 301-02) But Dr. Brateanu's minimal explanations of the medical findings that supported his assessments are vague at best. In similar situations, courts in the Sixth Circuit have held that an "ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject determinations of such a physician when good reasons are identified for not accepting them." *See Franklin v. Sec'y of Health & Human Servs.*, 875 F.2d 863, at *2 (6th Cir. 1989) (holding that an ALJ did not err in not accepting a treating physician's report that a claimant was totally impaired and had several medical impairments where the medical reports were vague, conclusory, and contained no objective medical evidence to support the findings); *see also Price v. Comm'r Soc. Sec. Admin.*, 342 F. App'x 172, at *3 (6th Cir. 2009).

I find that the ALJ's determination that Dr. Brateanu's opinions were unsupported by sufficient explanations and were inconsistent with other evidence in the record to have been supported by substantial evidence. Thus, the ALJ was permitted to reject these opinions, and she provided an adequate statement of reasons for doing so. *Francis v. Comm'r Soc. Sec. Admin.,* 414 Fed.App'x. 802, 805 (6th Cir.2011) ("The agency's treating-source rule permits an ALJ to reject a treating source's opinion if substantial evidence in the record contradicts it.")

Even if Dr. Brateanu's opinions and the other medical evidence were found to support the conclusions Barton urges, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." Id. at 773 (citations omitted). In this case, the ALJ reviewed the entire record, weighed the evidence, and concluded that Barton retained the ability to perform some work. Even assuming there is evidence in the record that supports Barton's claim that she was more limited than found by the ALJ, substantial evidence also supports the ALJ's conclusion. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir.2003) ("if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ," the Commissioner's decision cannot be overturned).

### E. The ALJ Properly Evaluated the Opinion of Consultative Examiner Dr. House

Barton also argues that the ALJ wrongly rejected the report and opinion of consulting examiner Dr. House. ECF Doc. 12, Page ID# 1272, 75. Barton argues that Dr. House's findings were consistent with the opinions of the treating psychiatrist, Dr. Feier.

Regarding Dr. House's opinion, the ALJ stated,

The undersigned gives little weight to Dr. House's opinions because it appears that Dr. House relied heavily on the claimant's statements as opposed to collateral information. For example, the claimant told Dr. House that her smoke detector was 'always on' because she burned food and her friend cleaned, did laundry, and shopped for her []. However, at medical appointments, the claimant repeatedly denied having any difficulty performing or completing routine daily living activities []. Although, the claimant told Dr. House that she had no friends, she also told Dr. House that a friend brought her to the examination and a friend cleaned did laundry, and shopped for her []. Such inconsistencies diminish the claimant's credibility and detract from Dr. House's opinions.

(Tr. 26)

As set forth above, opinions from a claimant's treating physician are entitled to controlling weight so long as the opinions are well supported by acceptable medical evidence and not inconsistent with the other substantial evidence of record. *Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Here, Dr. House was not a treating physician and his opinions were not entitled to any special deference. *See, e.g., Oliver v. Comm'r of Soc. Sec.*, 415 F. Appx. 681, 684 (6th Cir.2011) (noting that the brief nature of the relationship militates in favor of granting the examining source opinion limited weight); *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 452 (6th Cir.1986) (ALJ may reject opinion of one-time examining psychologist). Thus, the ALJ did not err by assigning less than controlling weight to Dr. House's opinion.

The ALJ assigned little weight to Dr. House's opinions after considering factors set forth in the regulations, including supportability of the opinion and consistency of the opinion with the record as a whole. (Tr. 26) Substantial evidence supports this determination. The ALJ noted Dr. House primarily based his opinions on Barton's statements, rather than collateral information. (Tr. 26) Because the ALJ also found Barton less than fully credible, she was justified in discounting the views of a consultant who appears to have largely relied on that same person. (Tr. 28) Likewise, the ALJ noted that Barton had not been hospitalized, had not

required or received intensive outpatient health services, and was able to perform or complete routine daily activities, all of which are inconsistent with the severe mental limitations found by Dr. House.  (Tr. 28-29)  Thus, under the applicable standard of review I find no error in ALJ's evaluation of consulting examiner Dr. House's opinion.

### F.     The ALJ Failed to Properly Evaluate Whether Barton's Use of a Cane was Medically Necessary

Barton argues that the ALJ wrongly rejected the requirement that Barton use a cane for both balancing and ambulation.  ECF Doc. 12, Page ID# 1277.  The Commissioner argues that substantial evidence supported the ALJ's finding that Barton's cane was not medically necessary.  ECF Doc. 13, Page ID# 1306.  The ALJ determined that the record did not support the medical necessity of Barton's "alleged" use of a cane pursuant to Social Security Ruling 96-9p.  (Tr. 29)

Social Security Regulation (SSR) 96–9p, 1996 WL 374185 at *7 (July 2, 1996), provides that a claimant's occupational base "may be significantly eroded" by the need to use a cane or other hand-held assistive device.  However, SSR 96-9p specifically requires:

> [M]edical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (*i.e.*, whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."  Id.  "For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded."

Id. at *7.

If a cane is not medically necessary, it cannot be considered a restriction or limitation on the Barton's ability to work, *Carreon v. Massanari,* 51 Fed.App'x. 571, 575 (6th Cir. 2002), and the ALJ is not required to reduce the claimant's residual function capacity accordingly.  *See Casey v. Sec'y of Health Servs.,* 987 F.2d 1230, 1235 (6th Cir. 1993).  A cane would be

medically necessary if the record reflects more than just the claimant's subjective desire to use the cane. *See Penn v. Astrue*, 2010 WL 547491, at *6 (S.D. Ohio Feb.12, 2010). If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the vocational expert. *See Casey v. Sec'y of Health Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993). "Where there is conflicting evidence concerning the need for a cane, it is the ALJ's task, and not the Court's, to resolve conflicts in the evidence." *Forester v. Comm'r of Soc. Sec.*, No. 16-CV-1156, 2017 WL 4769006 (S.D. Ohio Oct. 23, 2017) (internal quotation marks omitted).

Here the ALJ claimed to have found that Barton's use of a cane was not medically necessary pursuant to Social Security Ruling 96-9p, because the medical record did not support such a finding and because Barton "was given a cane because she requested it as opposed to it being prescribed." (Tr. 30) The ALJ's position misstates the medical record.

The ALJ correctly pointed out that Barton requested a cane prescription from Dr. Sey on April 22, 2013. Dr. Sey reported that plaintiff requested the cane because of back pain which was getting worse. (Tr. 789) Dr. Sey's musculoskeletal examination that day revealed normal range of motion in Barton's hips, knees, shoulders and spine; normal gait and reflexes. (Tr. 790) His assessment was that Barton's chronic lumbago appeared to be worsening, and the patient's plan was to, "see pain management in a week for prescription for cane." (Id.)

The evidence shows that on April 29, 2013, Dr. Rosenquist prescribed Barton a cane "to help with walking and to keep [Barton] steady when her right knee gives out." (Tr. 405, 408, 531, 534) Dr. Rosenquist noted that Barton had reported her knee often felt like it would give out on her. (Tr. 405, 531) Dr. Rosenquist observed tenderness on palpation over Barton's lumbar spine, bilateral lumbar paraspinal muscles, and the upper gluteal muscles and that Barton

had difficulty going from sitting to standing. (Tr. 407, 533) On May 6, 2013, physical therapist Wendy W. Warner of Cleveland Clinic provided Barton with and a cane and taught Barton how to use it for her knee pain. (Tr. 412, 538)

It is peculiar that the ALJ failed to include the fact that Dr. Rosenquist prescribed a cane in her analysis, particularly in light of the ALJ's inclusion of two detailed summaries of Dr. Rosenquist's notes from the April 29, 2013 appointment. (Tr. 19, 25) The ALJ stated that Dr. Rosenquist's notes indicated that Barton was "well appearing" and had a normal gait, but that there were also "pain to palpitation of the lateral right knee joint and crepitance with range of motion, degenerative changes and associated muscular pain, and bilateral lateral compartment osteoarthrisis of the knees. (Id.)

This is arguably some evidence in the medical record indicating that it may have been medically necessary for Dr. Rosenquist to prescribe a cane. The ALJ's conclusion to the contrary appears to have been predicated on the assumption that Barton "was given a cane because she requested it as opposed to it being prescribed."

Although the entirety of the ALJ decision recited many medical records concerning Barton's various limitations – or lack thereof – there was no discussion of Dr. Rosenquist's prescription of a cane, despite the ALJ's recitation of his other findings on the day he prescribed the device. Because the ALJ favorably cited Dr. Rosenquist's findings to support other points in her decision, we cannot conclude she generally rejected his findings and conclusions. Neither the court nor the claimant should be left to wonder whether the ALJ's failure to discuss Dr. Rosenquist's cane prescription was intentional or inadvertent. And, when an ALJ draws the conclusion that a cane is not medically necessary without discussing the specific findings of the prescriber on that issue, the court cannot make a meaningful review of that conclusion.

Without a sufficiently specific analysis of the medical necessity of a cane, we cannot conclude that the ALJ correctly applied the requirements of SSR 96-9p. A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant whose application has been denied understands why.

The ALJ's conclusion that a cane was not medically necessary under SSR 96-9p was crucial. Based on that conclusion, the ALJ did not include a cane requirement in the hypothetical questions to the VE. The record shows that the VE acknowledged that if a cane was necessary it would have eliminated all light work-rated jobs. (Tr. 66) Given the ALJ's RFC finding that Barton could perform less than the full range of light work, eliminating all light work jobs would have meant that no VE-supported evidence that there were jobs Barton could perform would have remained. Absent such evidence, the court would not have been able to find the ALJ's Step Five conclusion to have been supported by substantial evidence.

I recommend that the Commissioner's decision be vacated and that the matter be remanded on this basis so that the Commissioner can make a properly supported finding on the

limited issue of whether a cane was medically necessary.  If the Commissioner finds one was not

medically necessary then everything else in the ALJ's decision supports the denial of benefits

and the Commissioner's decision should stand.  However, if a cane is found to have been

medically necessary, then the Commissioner would be required to re-determine whether there are

jobs someone with Barton's characteristics can perform.

## VII.     Recommendation

The court should find the Commissioner's conclusion that Barton's prescribed cane was

not medically necessary under SSR 96-9p was not supported by substantial evidence.  However,

the Commissioner's handling of the medical opinion evidence of record was supported by

substantial evidence and requires no remand.  I recommend that the final decision of the

Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g)

sentence four, for further proceedings consistent with this Report and Recommendation.


Dated: December 8, 2017

Thomas M. Parker
United States Magistrate Judge




## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may waive the right to appeal the District Court's order.  See
*U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985),
reh'g denied, 474 U.S. 1111 (1986).